Filed 4/18/16  In re J.G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.G. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B264528<br>(Los Angeles County<br> Super. Ct. No. DK08045) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>YESENIA L.,<br><br>    Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Yesenia L. (Mother) appeals from jurisdictional and dispositional orders of the dependency court under Welfare and Institutions Code section 300, subdivisions (b) and (c)[1] with respect to her children, J.G. (born March 2005), Jasmine G. (born Oct. 2010), and Alison L. (born Nov. 2011). The court found jurisdiction based on allegations that Mother physically abused the children and subjected them to excessive interviews regarding alleged sexual abuse by a stepbrother. Mother contends that the court's jurisdictional findings are not supported by substantial evidence and that the court erred in removing the children from her custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Pre-filing Investigation*

The family consists of Mother, the children, and the children's respective fathers. All three children lived with Mother and C.C., Alison's father. J.G. and Jasmine's father, Jo.G. (Father), lived with his wife Elizabeth G. and her two children, Carlos and Jayden. Mother and Father had a custody order that gave Father joint custody and placed J.G. and Jasmine with Father every weekend. Mother and Father also had restraining orders against each other due to a fight in December 2013 between Father, Elizabeth, Mother, and C.[2]

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2014 after Jasmine told Mother that Carlos touched her vagina and caused her to bleed during a weekend visit with

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] According to the police report, when Father and Elizabeth were returning the children to Mother, Elizabeth struck Mother several times and someone named Cesar Lopez kicked Mother in the head with a steel-toe boot.

Father.  A social worker interviewed Father and Elizabeth.  Elizabeth denied the allegation, stating that they never left the children alone and supervised them constantly.  Elizabeth accused Mother of making threats against her and stated that the children were always dirty when they came from Mother's home.

Father stated that Mother was "using the kids to fight and start drama" and expressed his desire for full custody of the children.  He repeated Elizabeth's allegation that the children were often dirty and inappropriately dressed when Mother brought them.  Father explained that he never left the children alone because Mother's concern that Carlos bullied J.G. had resulted in a court order requiring Father's constant supervision of J.G. and Carlos.  Father stated that Carlos was "never near my daughter."  All the children slept in the same room at Father's house.

Carlos denied the allegations regarding Jasmine and told the caseworker that Mother was "trying to hurt our family."

On March 2, 2014, Mother reported that after Father brought the children home that day, Jasmine started complaining of rectal pain and a burning sensation while urinating.  Mother saw redness on Jasmine's thighs and swelling in her vaginal area.  Mother took Jasmine to a hospital, "but they did not take her seriously and did not help."  Mother was concerned that Carlos, who was 16 years old, sexually abused Jasmine.  Mother also reported that J.G. told her Carlos threatened to beat him up if he did not watch pornography with him.  Carlos denied looking at pornography or showing inappropriate pictures to J.G.

On March 4, 2014, a caseworker conducted an unannounced visit to Mother's house.  Mother was very upset and asked why she was being investigated when the sexual abuse occurred in Father's home.  She did not allow the caseworker into her home.

Approximately a week later, a caseworker intern conducted an unannounced visit to Mother's home. The intern interviewed J.G., who stated that he did not like going to Father's house because Carlos bullied him and forced him to view pornographic images. J.G. had never seen Carlos hurt Jasmine, but he stated that Jasmine cried whenever she was forced to go to Father's house because she preferred to stay with Mother or maternal grandmother. The intern was unable to interview Jasmine and Alison because they were too young. There were no signs of abuse or neglect on any of the children.

A March 3, 2014 forensic medical report indicated that an examination of Jasmine was normal. The examiner was not able to confirm or negate the allegations of sexual abuse. Another sexual abuse examination on March 31, 2014, yielded negative results. A caseworker thought Jasmine had been coached. A detective expressed the opinion that the allegations were unfounded because Carlos denied the allegation. The detective also thought that J.G. had been coached because J.G. initially denied the allegation that Carlos bullied him, but after speaking to Mother, he told the detective that Carlos showed him pictures of naked girls.

On April 8, 2014, J.G.'s elementary school contacted the caseworker to report suspected abuse and neglect, on the grounds that J.G.'s school attendance was poor and he often came to school "dishevel[ed] and dirty."

On April 16, 2014, Mother again insisted to the caseworker that Jasmine had been sexually molested by Carlos. Mother took Jasmine to the hospital, "but they did not take her seriously and did not help." Mother reported that Jasmine had begun wetting her bed and throwing tantrums when it was time to visit Father.

In June 2014, a referral was made to DCFS alleging that Mother neglected two-year-old Alison by accidentally leaving her at J.G.'s school for 20 minutes

before returning to retrieve her. During this time, Alison wandered around the school grounds unsupervised and was almost run over in the parking lot. Mother denied that she had allowed Alison to wander around for 20 minutes, stating that "it was only a second."

In August 2014, Father brought Jasmine to the police station to report that he had found bruises on her buttocks. Jasmine stated that Mother "hit me on the butt with an open hand because I did something bad." The caseworker noticed a bruise that appeared to have been made by a belt. Mother denied hitting Jasmine. She stated that Jasmine had eczema and that the bruise occurred when Jasmine hit herself with the stroller.

Medical examinations of the children in September 2014 indicated no evidence of physical or sexual abuse or neglect of any of them. The doctor described all three children as "alert" and "delightful" and noted that Jasmine suffered from eczema.

DCFS filed a section 300 petition in October 2014 alleging jurisdiction under subdivisions (a), (b), and (j). The petition alleged that Mother struck J.G. with belts, hangers, and her hands, and that she engaged in a violent altercation with Father and Elizabeth in December 2013. The petition further alleged that Mother subjected J.G. and Jasmine to excessive interviews regarding the alleged sexual abuse by Carlos and encouraged J.G. to give false information regarding the alleged abuse. The juvenile court detained the children and ordered J.G. and Jasmine released to Father. The court ordered Alison released to Mother on the condition that Mother comply with all the court's orders. In November 2014, DCFS filed an amended petition, adding allegations that Mother physically abused Jasmine and Alison by striking them with her hands and pulling Jasmine's hair.

5

*Jurisdiction/Disposition Report*

J.G. was interviewed in November 2014 for the jurisdiction/disposition report. He told the investigator that Mother hit him and Jasmine with a semi-closed hand when they "are bad." He further stated that Mother hit him once or twice with a hanger, but she did not hit Jasmine with a hanger. He said that he got a "red mark" on his arm when Mother hit him and that Jasmine got "dark marks." He stated that Mother hit Alison with an open hand, but he denied that Mother hit any of them with a belt or sandals.

When asked about the relationship between his parents, J.G. stated that Mother and Father fought and yelled at each other whenever they saw each other. He said that Mother initiated the arguments, but that Father responded by yelling back.

The investigator also interviewed Jasmine, who was three years old. Jasmine said that Mother was sometimes nice and sometimes mean to her. She stated that Mother sometimes grabbed her and put her in the corner or hit her with a semi-open hand. Jasmine also said that Mother spanked Alison with an open hand and hit J.G. with a hanger. Jasmine denied seeing any fights between Mother and Father. Jasmine also denied ever being touched "in her private part" or saying that anyone had done so. She said that Carlos was nice to her.

Mother denied using a belt, hanger, or any other object to discipline J.G. She stated that she spanked him with an open hand over his clothing and denied leaving any marks or bruises on him. As to Jasmine and Alison, Mother denied hitting them and stated that she gave them time outs or put them in the corner.

Mother denied telling J.G. to lie about Carlos showing him pornography and said she learned it was a lie when J.G. told her so. She said that "no one believed [her] daughter" because of J.G.'s lies about the pornography. Mother again said

that Jasmine told her that Carlos pinched her vagina and made her bleed. She panicked when Jasmine told her and therefore took her to the police station.

Father said J.G. and Jasmine had bruises and marks on their faces, legs, buttocks, and backs every time he picked them up for visits. The children initially explained the marks by saying they fell, hit themselves, or were scratched by pets, but eventually they told Father that the marks were caused by Mother hitting them with her hand or hangers. J.G. told Father he was afraid to talk about what Mother did because Mother told him the social workers would take the children away if he did. Father also reported that J.G. said Mother asked them to lie.

Father denied that Carlos abused Jasmine, explaining that Jasmine never said anything about it or expressed fear about being alone with Carlos. Father also said that Carlos, a respectful "straight A student" who "never gets in trouble," denied touching Jasmine. When Father asked Jasmine about it, she repeatedly told him Carlos "touched [her] and blood came out," but Father thought Jasmine "was being asked to say this." According to Father, he began having issues with Mother after she learned he had a girlfriend and after he filed a petition in family court for custody of the children. Mother became aggressive and started arguing with him and accusing him of not taking care of the children.

According to Elizabeth, J.G. told her Mother beat him for telling the truth during family court proceedings and Jasmine told her Mother hit her for calling Elizabeth "mommy."

DCFS concluded that Mother was the "primary aggressor" in the family and recommended detention of J.G. and Jasmine from Mother, but recommended that Alison remain under Mother's care.

In a January 2015 Last Minute Information for the Court, DCFS stated that Mother admitted spanking J.G. and Jasmine once and denied ever hitting Alison.

C.C. said that he had lived with Mother for three years and that she occasionally spanked the children with an open hand but never used belts, hangers, or any other objects. When asked why the children would say she hit them, C.C. speculated that the accusations came from Father. C.C. explained that he and Mother learned about the sexual abuse allegations after they found J.G. searching for sexually explicit material on the computer, which he said Carlos had shown him. C.C. did not think Mother subjected the children to excessive evaluations, stating that she only had Jasmine examined once, after Jasmine told her Carlos pinched her vagina and made her bleed.

At a January 22, 2015 Multi-Disciplinary Case Planning Committee Meeting, Mother agreed to participate in a mental health evaluation, counseling, and parent education. DCFS stated that Mother had participated in family preservation services but had failed to attend seven out of ten toxicology tests scheduled between November 2014 and January 2015. The three tests she took were negative. DCFS asked the court to advise Mother that failure to comply with the weekly drug testing could result in Alison's removal from her care. Although Mother complied with all the other court orders, she was not consistent with the weekly drug testing; therefore, in March 2015, Alison was removed from Mother's care and placed with C.C. Mother voluntarily moved out of the home.

*Adjudication Hearing*

At the March 2015 adjudication hearing, the juvenile court ordered stricken all counts except counts b-1 and b-2, which alleged that Mother subjected J.G. and Jasmine to excessive interviews regarding sexual abuse and that she physically abused the children by striking J.G. with hangers and striking all three children with her hands. The court added count c-1, alleging that Mother created a

8

detrimental home environment by subjecting J.G. and Jasmine to excessive interviews regarding Mother's reports of sexual abuse.

Mother and maternal grandmother testified at the adjudication hearing. The court found neither credible and expressed the opinion that they were harming the children. The court declared the children persons described by section 300, subdivisions (b) and (c). The court found that remaining in Mother's home would pose a substantial risk of harm to the children, there were no reasonable means other than removal to keep them safe, and DCFS made reasonable efforts to prevent removal. The court removed the children from Mother's custody and ordered six random drug tests, a parenting class, a psychological assessment, individual counseling, and monitored visits. Mother timely appealed.

**DISCUSSION**

Mother contends the evidence is insufficient to support the juvenile court's findings of jurisdiction under section 300, subdivisions (b) and (c). She further contends the court erred in removing the children from her custody under section 361.

I.    *Section 300 Findings*

A child is within the jurisdiction of the juvenile court under section 300, subdivision (b) if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).) "'Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300 . . . .' To establish jurisdiction under section 300, subdivision (b), the department

must prove by a preponderance of the evidence that there was neglectful conduct by the parent in one of the specified forms; causation; and "'serious physical harm or illness'" to the child or 'substantial risk' of such harm or illness. [Citations.]" (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) "Subdivision (c) requires a showing that [the child] 'is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others' and that either the parent is causing the emotional damage or the parent is not capable of providing appropriate mental health treatment. [Citation.]" (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.)

"We review the juvenile court's findings under section 300 for substantial evidence and will affirm the judgment based on those findings if they are supported by reasonable, credible evidence of solid value. [Citation.]" (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1160.) "'It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.)

Substantial evidence supports the juvenile court's finding of jurisdiction under count b-2, which alleged physical abuse. Mother cites various reports in the record that indicated no evidence of physical abuse to support her challenge to the

jurisdictional finding. Nonetheless, there is substantial evidence in the record to support the court's finding under section 300, subdivision (b).

In April 2014, J.G. told the caseworker that Mother hit him with a hanger and her hand, leaving red marks on his body. In August 2014, Father took Jasmine to the police station to report that he found bruises on her buttocks that appeared a few days old. Jasmine said Mother "hit [her] on the butt with an open hand because [she] did something bad." In November 2014, J.G. told the dependency investigator that Mother hit him once or twice with a hanger and hit Jasmine and Alison with her hand. He said that he got a "red mark" on his arm when Mother hit him and that Jasmine got "dark marks." J.G. further stated that Mother hit them "all the time when we are bad," and that she hit Jasmine "really hard." Jasmine reported that Mother hit her with her hand and hit J.G. with a hanger. She stated that she turned "black" where Mother hit her.

Mother cites section 300, subdivision (a)'s provision that "'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury." (§ 300, subd. (a).) However, she does not challenge the findings that she hit J.G. with a hanger and that she inflicted marks on the children when she hit them. The evidence that Mother hit a nine-year-old child with a hanger and hit a four-year-old child hard enough to leave marks on her is sufficient to support the juvenile court's finding of jurisdiction under section 300, subdivision (b).[3]

---

[3]    "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; see also *In re Ashley B.* (2011) 202

II.     *Removal under Section 361*

Mother contends the juvenile court erred in removing the children from her custody under section 361.  "Under section 361, subdivision (c)(1) children may not be removed from their home 'unless the juvenile court finds clear and convincing evidence' of a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being 'and there are no reasonable means' for protecting the children other than removal from their home.  The statute 'is clear and specific:  Even though children may be dependents of the juvenile court, they shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no "reasonable means" by which the child can be protected without removal.'  [Citation.]

"To aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home, the California Rules of Court require DCFS to submit a social study which 'must include' among other things:  'A discussion of the reasonable efforts made to prevent or eliminate removal.'  (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)"  (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*).)  "The court shall state the facts on which the decision to remove the minor is based."  (§ 361, subd. (d).)

"The standard of review of a dispositional order on appeal is the substantial evidence test, 'bearing in mind the heightened burden of proof.'  [Citations.]  The

---

Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate."].)  In light of our conclusion that the court's finding of jurisdiction under section 300, subdivision (b) is supported by substantial evidence, we need not address Mother's challenge to the finding under section 300, subdivision (c).

appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's findings or orders. [Citation.]" (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

Mother contends that the court's removal order is not supported by substantial evidence and that the court failed to consider less drastic measures than removal, such as unannounced visits or weekly in-home visits by a parenting instructor. (See *In re Henry V.* (2004) 119 Cal.App.4th 522, 529 (*Henry V.*) [dispositional order removing the child not supported where "the court did not mention the existence of alternatives to out-of-home placement," despite stating there were no other reasonable means to protect the child].)

First, we disagree with Mother's contention that the children suffered no physical harm. As discussed above, there was substantial evidence to support the court's finding of physical abuse of the children.

Mother's failure to acknowledge the physical harm she caused supports the court's finding that there were no reasonable means to protect the children other than removal. Mother denied striking J.G. with a hanger or causing him any marks or bruises. She also denied ever using corporal punishment on Jasmine or Alison. Mother's lack of insight into her behavior supports the court's decision to order the children removed. (Compare *Ashly F.*, *supra*, 225 Cal.App.4th at p. 810 [finding "[a]mple evidence" of reasonable means to protect the children in the home where the mother expressed remorse for the injuries she inflicted on her child and was enrolled in a parenting class].) The court was not required to discuss alternatives to removal, especially where there was no evidence presented that alternative services could have prevented removal. (Compare *Henry V.*, *supra*, 119 Cal.App.4th at p. 529 [there were other reasonable means to protect the child

13

where there was "ample evidence that appropriate services could have been provided . . . in the family home"].)

Mother further argues that the court improperly ordered removal in order to secure her future cooperation. (See *Henry V.*, *supra*, 119 Cal.App.4th at pp. 529-530 ["The social worker's suggestion that out-of-home placement would be useful to secure [mother's] further cooperation was not a proper consideration. The statutory grounds for removing a child from parental custody are exclusive. A mother's fundamental right to the custody of her child is not a bargaining chip."].)

DCFS responds by pointing out Mother's previous refusals to cooperate with DCFS and her failure to take responsibility for the children's removal. DCFS cites numerous reports in the record indicating Mother's lack of cooperation. For example, Mother missed appointments in April and May 2014, and she refused to allow the caseworker into her home on March 4, 2014. On August 27, 2014, she did not allow the caseworker to interview the children privately, and in October 2014, she refused to provide information about C.C. and refused to speak privately to the caseworker, who did not want to discuss allegations in the children's presence.

In light of Mother's failure to acknowledge the physical harm she caused her children and her refusals to cooperate with DCFS, we conclude that the removal order is supported by substantial evidence.

**DISPOSITION**

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:



EPSTEIN, P. J.



MANELLA, J.