Filed 11/4/25  In re M.C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.C. et al., Persons Coming Under the Juvenile Court Law. | B343732 (Los Angeles County Super. Ct.  No. 20CCJP01369) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.M., Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Cristina G. Legaspi, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

R.M. (mother) appeals from a juvenile court judgment asserting jurisdiction over her children P.S. (born December 2015), M.S. (born May 2012) and M.C. (born October 2008), and dispositional orders removing the children from her custody. Mother does not challenge the juvenile court's orders as to 12-year-old M.S. and 9-year-old P.S. However, she challenges the judgment asserting jurisdiction over 16-year-old M.C. and the dispositional order removing M.C. from her custody. We find no error and affirm the juvenile court judgment and removal order concerning M.C.

## COMBINED FACTUAL AND PROCEDURAL HISTORY
**The family**

Michael C. (father) is M.C.'s father.[1]

Noel S. is the father of M.S. and P.S.[2]

At the time the petition was filed, the three children resided with mother. Father resided in Riverside County.

**The family's prior child welfare history**

In December 2010, DCFS received a referral alleging mother pepper sprayed father. The referral was substantiated. A voluntary case was initiated, but mother refused services.

In November 2012, a referral alleged mother was yelling and cursing at her children, mother engaged in physical altercations with another woman, and mother allowed the children to be outside unsupervised. The referral was closed as inconclusive.

In 2013, a referral alleged M.C. was sexually abused by minor relatives. The referral was closed as inconclusive.

---

[1]     Father is not a party to this appeal.

[2]     The Los Angeles County Department of Children and Family Services (DCFS) was unsuccessful in making contact with Noel S., who did not participate in the proceedings.

In May 2016, a referral alleged mother pepper sprayed Noel S.  It was closed as inconclusive.

In February 2020, a referral alleged M.S. had bruising throughout his body and a laceration and swelling on his cheek.  M.S. stated he accidentally hit P.S. with a "Nerf" toy gun.  Mother instructed M.C. to get an extension cord and hit M.S. with it.  M.C. complied, causing the injuries to M.S.  M.S. reported older marks were caused by mother hitting him during a different incident.  M.S. was scared to return home.  The referral was substantiated.

The juvenile court sustained a Welfare and Institutions Code section 300 petition[3] alleging mother instructed M.C. to physically discipline M.S., causing a pink loop pattern with scab on his left side, a pink loop pattern mark on both legs, a pink bruise to the left leg and right arm, a red scratch with pink bruising under his right eye, a red scratch to the chest, a bruise to the right leg, and a pink, red loop pattern mark on the chest.  The petition also alleged M.S. had aged bruises and marks, that M.S. had been hit by M.C. with brooms and cords, and that mother had, on prior occasions, struck the child's body with an extension cord, a belt, and an open hand.

At the disposition hearing, the children were placed with mother and father.  The court ordered parenting classes, individual counseling, and conjoint counseling with the children.  Noel S. was not offered reunification services.

In February 2021, a section 387 petition was filed alleging mother failed to comply with the juvenile court family preservation program and failed to enroll the children in required services.  In addition, mother failed to allow DCFS access to the children.

The juvenile court removed the children from mother's custody.  It placed M.C. in father's custody and terminated jurisdiction as to M.C.

---

[3]     All further undesignated statutory references are to the Welfare and Institutions Code.

Mother appealed from the juvenile court's February 2021 jurisdiction and disposition orders as to all three children. This court affirmed the juvenile court's orders. (*In re M.C.* (Jan. 19, 2022, B311013) [nonpub. opn.].)

The juvenile court returned M.S. and P.S. to mother's custody in December 2021 and terminated jurisdiction over them in May 2022.

In April 2024, a referral alleged M.C., then age 15, knew the code to mother's gun safe and accessed the safe to obtain a document. She moved the gun, which went off and shot her right index finger. She was treated at the hospital. The referral was closed as inconclusive.

**Current referral and investigation**

On September 24, 2024, DCFS received a referral alleging mother physically abused P.S. P.S.'s teacher said P.S. came to school with a purplish mark on his right eye. P.S. said mother hit him in the face with a cord, and it felt like she punched him. P.S. had mentioned in the past that mother would " 'whoop [his] ass.' "

The DCFS social worker met with P.S. at his school on September 25, 2024. There was a faded mark with a bandage over it under his eye. When the social worker asked P.S. what happened, P.S. responded, "My mom said I can't tell anyone. She doesn't want people telling her business." P.S. then stated mother "whooped" him. He threw down an electronic tablet without a protective case, so mother got the cord and hit him on the thighs, arms, and then the face. The beating hurt. P.S. said mother disciplined him by "whoopings" on the thighs, arms, and legs, leaving marks. Mother also hit him with a bare hand on the thighs. P.S. informed the social worker mother disciplined M.S. the same way. In addition, mother and M.C. wrestled over a phone, and mother hit M.C. with her hands.

The social worker observed a scabbed, curved mark on P.S.'s upper left arm, which he also said was caused by mother.

When contacted at his school, M.S. would not discuss the allegations with a social worker.

4

The social worker visited mother at her home on September 30, 2024. Mother denied she hit P.S. and denied using objects to discipline the children. Mother allowed the social worker to speak with P.S., but not privately. P.S. looked toward mother while answering. He now stated his eye injury was sustained from a teammate during football practice and denied mother used objects to discipline him.

Mother refused to take P.S. to a medical provider not chosen by mother. Mother said she would take P.S. to a doctor on October 2, 2024, and would provide proof. Later, mother refused to provide paperwork.

The social worker met with M.C. outside the home on October 3, 2024. Mother would not allow the social worker to enter the home. M.C. claimed P.S.'s injury was due to playing football with M.S. M.C. denied mother used objects to discipline her or her siblings. The interview was cut short by mother.

On November 7, 2024, P.S. was placed on a mental health hold due to out-of-control behavior at school. Responding mental health staff reported P.S. stated mother hit him with an extension cord, which made him upset. P.S. was released to mother that night.

On November 20, 2024, P.S.'s school staff contacted DCFS to report P.S. had not returned to school since November 7, 2024. Mother denied this, insisting P.S. was at school. Mother said she had not been contacted by the agency that was supposed to set up services for P.S. after his discharge. P.S.'s school staff reported mother had a history of claiming she had not received calls from the school when the school tried to reach her about P.S. P.S. had 40 absences since school started in August.

Father reported he did not know how mother disciplined the children, but mother and M.C. had bad verbal communication with each other. Mother did not enroll M.C. in school for the first few months of the school year. M.C. mainly spent time with her grandmother.

On December 4, 2024, DCFS served a warrant removing the children from mother. M.C. first stated she wanted to go to

the maternal uncle's home with her brothers, and father agreed to this. Later, M.C. refused to leave mother's home.

**Petition and detention hearing**

On December 6, 2024, DCFS filed a petition pursuant to section 300 on behalf of M.C., M.S., and P.S. The petition contained allegations under section 300, subdivisions (a), (b), (c), and (j), alleging the children were at risk due to mother's physical abuse of P.S. and mother's failure to secure mental health treatment for P.S.

On December 9, 2024, neither mother nor M.C. appeared at the detention hearing. The court found a prima facie case had been made and detained M.C. from mother. She was released to father. The matter was continued to December 11, 2024.

Mother and M.C. appeared in court on December 11, 2024. Mother's counsel argued M.C. should be released to mother, arguing she was differently situated from the other children. M.C. was described as a responsible individual who did not want to be sidetracked from school by having to live with her father. M.C. was willing to go to the maternal uncle's home if the court was not willing to release her to mother, but would require transportation assistance to attend her school of origin. The court again detained M.C. from mother and released her to father. The court granted DCFS discretion to allow M.C. to stay with the maternal uncle and her siblings.

The court ordered that no one discuss the petition allegations with the minors.

**Jurisdiction/disposition report**

DCFS filed a jurisdiction/disposition report in January 2025.[4] Although M.C. had been released to father's care, she was residing at the home of maternal uncle with her siblings. M.C. said she planned to stay at the maternal uncle's home throughout the case so she could attend her current school. Her father gave her permission to do so. M.C. said she felt unsafe with father because he yells when he is upset. She denied

---

[4] The report erroneously indicates a date in January 2024.

6

physical abuse. M.C. asked to receive therapy, as she thought it would benefit her.

M.C. did not move to the maternal uncle's house until her school break began on December 20, 2024. She said she and mother had a good relationship, and denied mother ever hit or yelled at her.

When father was asked whether M.C. ever reported physical abuse to him, father stated, "She's coached very well. If I start asking something, she'll start talking, but then freeze up and cold shoulder and blow it off. I know something's there, but she's trying to protect mother." When asked if he had any concerns about mother meeting the children's medical needs, father stated when M.C. shot her finger because mother was not there, M.C. took herself to the hospital. For the follow-up appointment, father took M.C.

Mother did not make herself available to be interviewed.

A maternal aunt said mother was overwhelmed and needed help. The aunt explained the family practiced discipline with an open hand on the bare buttocks or thighs. She denied seeing mother hit the children with an object and thought mother and the children needed counseling.

DCFS noted it had no safety concerns regarding father and would typically recommend termination of jurisdiction over M.C. with a family law order granting father sole custody of M.C. However, due to M.C.'s refusal to reside with father, DCFS did not have a recommendation.

**Adjudication hearing**

The adjudication hearing was held on January 2, 2025.

Counsel for P.S. and M.S. argued the juvenile court should sustain the physical abuse counts. Counsel for M.C. asked the court to dismiss the physical abuse counts and sustain the counts regarding neglect of mental health treatment and asked the court to take jurisdiction over M.C.

Mother's counsel argued the court should dismiss the petition or, alternatively, should dismiss the petition as to M.S. and M.C.

7

The juvenile court sustained counts a-1, b-1, and j-1, alleging mother physically abused P.S. by striking him with a cord, and that the excessive physical abuse caused him unreasonable pain and suffering and put his physical safety and health, and the physical safety and health of his siblings, at risk of serious harm.

The juvenile court also sustained counts b-2 and j-2, alleging P.S. suffers from mental and emotional issues which require regular mental health treatment, and that mother failed to ensure the child received mental health treatment. Such neglect by the mother endangered the child's physical health and safety and placed P.S. and his siblings at risk of serious physical and emotional harm.

The court explained its findings that the older two children, M.S. and M.C., were persons described under section 300. The court noted, "I am not finding that they're differently situated, despite the age difference." The court noted there was a previous sustained petition concerning M.S. and M.C., which included "[t]he same patterns. Hitting with extension cords, leaving marks. The same allegations as the physical abuse allegations that we have today." The court detailed P.S.'s injuries and stated, "This court does believe that [M.C.] and [M.S.] were at risk for those."

The court stated its tentative was for M.C. to be ordered to home of father, because father was nonoffending. The court further noted father could make any alternative plans for M.C. to stay elsewhere. DCFS submitted on the court's tentative. M.C.'s counsel asked the court to release M.C. to both parents, accommodating M.C.'s desire to live with mother. Father's counsel did not take a position on whether M.C. should be released to both parents or just to father, but did ask that the court terminate jurisdiction over M.C. Mother's counsel argued M.C. should be placed with mother.

The court ordered M.C. placed home of father. The court acknowledged M.C. did not want to live with father, and stated father and M.C. could make a plan for M.C. to reside with

8

relatives.  The court ordered jurisdiction over M.C. terminated, but stayed the order pending receipt of a family law order granting joint legal custody and sole physical custody to father, with mother having unmonitored visits.

The court ordered M.S. and P.S. removed from mother with reunification services and monitored visits.

On January 22, 2025, mother filed her notice of appeal.

## DISCUSSION
### I.   Jurisdictional findings

Mother first challenges the jurisdictional findings as to M.C., arguing there was no evidence M.C. was at current risk of harm based on any of the allegations.

### A.   *Applicable law and standard of review*

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (a) if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent.  (§ 300, subd. (a).)  For the purposes of this subdivision, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian."  (*Ibid.*)

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (b) if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of the parent's failure or inability to adequately supervise or protect the child, or an inability to provide regular care for the child due to the parent's mental illness.

A child comes within the jurisdiction of the juvenile court under section 300, subdivision (j) if the child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected as defined in those subdivisions.  In determining the

9

risk to the child, the court "shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid.*) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*) We must " ' " review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence" ' " such that a reasonable trier of fact could find the order is appropriate. (*Ibid.*)

"Substantial evidence is any evidence which is of ponderable legal significance but it is not synonymous with *any* evidence; rather it must be 'reasonable, credible and of solid value.' " (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.)

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the child to the defined risk of harm. Previous acts of neglect alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur." (*In re G.Z.* (2022) 85 Cal.App.5th 857, 877.) "Perceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence." (*Id.* at p. 883.) However, if a current risk exists, the juvenile court may take jurisdiction before the child has suffered

10

any actual harm.  (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1002–1003.)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

### B. *Substantial evidence supports the juvenile court's finding that M.C. was at substantial risk of serious physical harm*

#### 1. *Physical abuse allegations*

Mother argues there was no substantial risk of serious physical harm to M.C. due to mother's physical abuse of P.S.  Mother argues there were no allegations she disciplined M.C. inappropriately, nor was there a claim M.C. was in the home when mother's abuse of P.S. occurred.  In addition, P.S. had a variety of behavioral issues, to which mother reacted inappropriately, and there was no evidence M.C. had such issues.  M.C. was 16 and was "extremely responsible."  She was able to navigate the greater Los Angeles area via public transportation, indicating a degree of independence and an ability to look after herself.  Mother argues although the court referenced the 2020 case, M.C. was not then injured.  Instead, mother directed M.C. to physically discipline M.S.  Mother argues M.C. had a good relationship with mother, and there was no evidence of a substantial risk of future injury.  For these reasons, mother argues the physical abuse allegations must be vacated as to M.C.

The juvenile court was permitted to take into account evidence of past conduct in determining whether M.C. was at risk of harm.  Mother had a long history of violence, including allegations of pepper spraying both fathers and engaging in a

11

physical altercation with an adult woman. Mother was first accused of physically abusing M.C. in 2011.

In February 2020, mother directed M.C. to physically abuse M.S., and M.C. complied. M.S. had bruising throughout his body and a laceration and swelling on his cheek after M.C. struck the child with a cord about 18 times. Mother also directly abused M.S. The juvenile court found the abuse put M.S.'s siblings at risk, ordering all three children removed from mother's custody.

The current sustained allegations show mother has continued this pattern of violence and abuse. There was also evidence mother coached the children so they would not speak the truth about mother's actions. Despite mother's coaching, there remained evidence mother engaged in violence with M.C. P.S. initially reported an incident in which mother and M.C. wrestled over a phone. He also initially reported mother would hit M.C. with her hands.

Further, mother had previously involved M.C. in the abuse, directing her to physically abuse M.S. to the point where M.S. had significant injuries. Mother's willingness to involve M.C. in violence against her siblings put M.C. at significant risk of harm. This evidence supports the juvenile court's determination that M.C. was a person described under section 300, subdivisions (a) and (j).

**2.** *Failure to follow up on mental health concerns*

The court also found M.C. was at substantial risk of serious harm due to mother's failure to follow up on P.S.'s mental health issues. Mother argues there is no substantial evidence mother's failure to follow up on P.S.'s mental health issues created a serious risk of harm to M.C. Mother argues M.C. was stable and productive in school, demonstrating no behavioral challenges or school attendance concerns. Mother argues the juvenile court's order finding the mental health allegations true as to M.C. must be vacated for these reasons.

We disagree. Mother's failure to follow up on P.S.'s mental health needs exacerbated the volatile situation in the home. Maternal relatives reported mother was overwhelmed by the

12

boys' behaviors, and further noted the family needed help and the children needed counseling. P.S.'s difficult behaviors were a trigger for mother's violence, which put all three children at risk. Mother's failure to follow up with mental health care caused a substantial risk to M.C.

In addition, mother's behavior in failing to follow up with P.S.'s mental health care reflected neglect that had manifested in other ways. Mother did not take M.C. to the doctor after M.C. accidentally shot her finger, and mother failed to timely enroll M.C. in school.

The above-described evidence supported the juvenile court's determination that M.C. was at substantial risk of harm due to mother's failure to follow up on P.S.'s mental health care, and was a person described under section 300, subdivisions (b) and (j).

## II. Dispositional order removing M.C. from mother's care

Mother argues even if the jurisdictional findings are affirmed, there is no substantial evidence to support the order removing M.C. from mother.

### A. *Applicable law and standard of review*

Under section 361, subdivision (c)(1), a juvenile court may remove a child from a parent's physical custody when it finds, by clear and convincing evidence, there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child were returned home, and there are no reasonable means to protect the child without removal from the parent's custody.

A child need not have been actually harmed before DCFS and the juvenile court may intervene. (*In re Eric B., supra,* 189 Cal.App.3d at pp. 1002–1003.) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

13

" 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.' " (*In re A.E.* (2014) 228 Cal.App.4th 820, 825.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

### B. *Substantial evidence supports the juvenile court's removal order*

Mother emphasizes the heightened burden of proof for removal of a child from a parent's custody, and notes that the higher burden of proof may result in a reviewing court affirming a jurisdictional order but reversing a dispositional order removing the child from the home. (Citing *In re Hailey T.* (2012) 212 Cal.App.4th 139, 148.) Further, mother argues even if there were a substantial danger of harm, there must also be no reasonable means to prevent removal. (Citing *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 293.) Mother points out M.C.'s counsel asked that she be released to mother, and father had no objection to M.C. being released to mother. Mother's counsel suggested mother could be ordered to live with the maternal uncle and participate in counseling in order to avoid the necessity of removal.

Bearing in mind the heightened standard of review, we find the record supports the juvenile court's determination there was a high probability of a substantial danger to M.C. if she remained in mother's home, and there were no reasonable means to protect her without removal. Mother has a long history of violence towards her children, her partners, and others. Mother had

taken no responsibility for her actions and, at the time of the jurisdiction hearing, had not engaged in any services to correct them. Past services had been unsuccessful in preventing the current violence. Thus, mother's suggestion that she be ordered to participate in counseling was not a viable alternative.[5]

Further, there was evidence M.C. was coached by mother. Given the evidence of coaching, the juvenile court was permitted to infer M.C. was unsafe in mother's home, despite M.C.'s comments she had suffered no harm there.

This evidence supports the juvenile court's determination, by clear and convincing evidence, that there existed a substantial danger to M.C.'s physical health, safety, protection, or physical or emotional well-being if she were returned to mother, and there were no reasonable means to protect M.C. without removal from mother's custody.

**DISPOSITION**

The judgment and the removal order as to M.C. are affirmed.

---

[5] We note that P.S. and M.S. were placed with the maternal uncle. Mother does not challenge the removal orders of P.S. and M.S. Because the two boys were placed with maternal uncle, mother's suggestion that M.C. be required to live with maternal uncle was not tenable.

                              CHAVEZ, J.

We concur:


LUI, P. J.


RICHARDSON, J.